Uicholsom', C. J.,
delivered the opinion of the Court.
Henderson E. Robertson died intestate in • Erank-lin county in 1859. He left surviving him his widow, C. E. Robertson and five children, viz.: Victoria E., H. J., Lizzie M., Wm. M., and Belle *138 R. Robertson, all of whom were minors at the time of his death, and the three last were minors at time of filing the bill in this case, on the 24th of July, 1866. He died seized and possessed of a tract of land of about fifteen hundred acres, and of about eighty-eight slaves, of which he owned in his own right about fifty-one, and the other thirty-seven belonged to his children, by gift from their grandfather. The property was kept together, and managed by the administrator and guardians until April, 1863, when the last appointed guardian resigned, and the control and management of the estate was assumed by the widow, but under no appointment as guardian. No division of the property, real or personal, was made, nor was dower allotted to the widow.
During the years 1861 and 1862, a large quantity of cotton was raised, by the slaves on the plantation, which was on -hand, in the seed, in April, 1863, when the last guardian resigned.
This cotton was undisposed of, in the summer of 1863, when the widow removed to Georgia with all of the children, except H. J. Robertson, who was in the Confederate army. She carried with her all the slaves except five or six, leaving the plantation and property,, including the cotton to be managed, controlled, and disposed of by her agent, J. M. Bratton. After reaching Georgia, in November, 1863, her daughter Victoria was married to J. J. 'Williams. On the 19th of March, 1864, George Simmons, who lived in Eránklin county, *139 went to Columbus, Georgia, where the widow and her family were residing, and from J. J. Williams, as the agent of the widow, purchased a portion of the cotton left on the plantation in charge' of her agent Bratton; when they entered into the following contract, viz.:
Reeusee’s Home, near Columbus, Ga.,
March 19, 1864.
I have sold to George Simmons thirteen thousand seven hundred and eleven dollars’ worth of cotton at fifty cents per pound, Confederate Treasury notes if there he enough cotton to that amount, if not, the amount of deficit to be returned in Confederate currency, or bonds. Mr. Bratton will please deliver said cotton to Mr. Simmons at the place where it is stored at present.
C. R. RobeRtsoít,
By J. J. Williams, Agent.
With this order Simmons returned to Tennessee, and received from Bratton one hundred and nine thousand pounds of seed" cotton, of which he sold about seventy thousand pounds at from twelve and a half to fifteen cents per pound, receiving payment in greenback currency — the residue was carried to a gin to be picked and baled, but all of it except about three bales, was destroyed by the burning of the gin-house.
On the 24th of July, 1866, complainants filed the bill in this case, in u&ich they allege,' that as the heirs at law of H. 3T. Robertson, deceased, *140 they, with defendant, O. E. Robertson, widow of said intestate, were joint owners of about one hundred and seven thousand pounds of seed cotton, situated on the plantation of which said H. E. Robertson died seized and possessed, being the crops of 1861 and 1862. That in March, 1864, defendant, 0. Robertson, undertook to sell, through defendant J. J. "Williams, as her agent, a large lot of cotton on the farm aforesaid, to defendant Simmons, and received in consideration an illegal and worthless issue, known as Confederate money, which was illegal, and void, and no payment in law; and a considerable amount of which was counterfeit. That soon afterwards said Simmons went upon the estate of their ancestor, and took therefrom, and converted to his own use, the said lot of cotton of one hundred and seven thousand pounds, it being a largely greater quantity than the amount so purchased. That none of said cotton had been reduced to possession by. defendant Williams, and that he had never seen the cotton after his marriage with complainant Victoria E. That defendant C.E. Robertson, was not the guardian or legally appointed agent of complainants, all of whom were minors; and had not authority to make such sale. That the cotton was in hulk, had never been divided among the owners, and that this fact, as well as the ownership, and the want of authority to sell, was known to said Simmons. That he fraudulently concealed the fact that a friend in Tennessee had sent word' to defendant 0. E. Robertson, proposing *141 to sell the same for good, funds for the benefit of herself and family.
The bill prays for an attachment against the property of Simmons, ’ sufficient to satisfy the amount due complainants; that an account be taken showing the amount of cotton converted and the respective shares of conrplainants; that said sale of the cotton be set aside, and that Simmons be required to pay therefor, and for general relief.
To this bill defendant Simmons demurred upon the general grounds that the complainants have an unembarrassed remedy at law, and that there is no equity in the bill. The Chancellor overruled the demurrer, and it is • now insisted that this action of the Court below was erroneous. We think not, for the reason that the bill alleges that defendant made the sale without any legal authority;, that defendant had knowledge of her want of authority, and of the ownership of complainants, who are alleged to have been minors,, and that he entered upon the estate of their ancestor, and took possession of and converted the cotton. These allegations being admitted by the demurrer, complainants have a right to treat defendant as a trustee, and to hold him accountable as such for the mesne profits of the estate: 1 Sto. Eq., § 511; 2 Sto. Eq., § 1856; Meigs’ Dig., §§ 1111 and 1112; Nelson v. Allen, 1 Yer., 374.
Defendants C. E. Robertson and J. J. Williams answer, and admit all the allegations in the bill. Defendant Simmons, then answers and. admits the *142 purchase of the cotton as alleged. He states that when he concluded to invest his Confederate money in cotton, he knew of the cotton of complainants, and as he preferred to buy cotton with the prospect of an early disposition of it, be went to Columbus, Georgia, and proposed to buy the cotton in question. He supposed the widow was authorized to sell, and the sale was in all respects fair and free from wrong. He states that the trade ■was made with the approval of defendant Williams and his wife, Victoria E. When the Confederate money was counted and .paid, it was agreed if any of it was counterfeit it was to be made up. He had no knowledge that any of the money was counterfeit. He denies that he had any knowledge that a friend of the widow in Tennessee had offered to sell the cotton for- her, but states that he acted in perfect good faith.
Defendant states, that owing to the condition of the country at the time, the cotton was only of a nominal value, and that under the circumstances, he paid a full price, and that in fact, most of -the cotton was burned and destroyed before he got it to market.
He insists that defendant Williams and wife were present and assented to the trade, and received the money. He insists further, that the interest of his wife passed to Williams by his marital right, and that he had the authority to sell. He charges, that the bill is really the bill of defendants C. E. "Robertson and J. J. Williams. He says that the widow *143 owned a child’s part of the personal estate. He asks leave to file his answer as a cross-bill against complainants, and defendants C. F. Robertson and J. J. "Williams, which was done.
In the answer of defendants to the cross-bill, the amount of the interest of the widow, C. F. Robertson, is submitted . to the Court, upon the statement that dower had not b^en allotted; that fifty-one of the slaves -belonged to the intestate, and thirty-seven to his children by gift from their grandfather, and that the cotton was the joint product of all the slaves.
Defendants admit’ the sale of the cotton by 0. F. Robertson, by her agent, J. J. Williams, and say the condition of the country where the cotton was situated, may have been such as stated by complainant in the 'cross-bill; and that the sale was made on account of his representations as to danger of loss and destruction to which the cotton was exposed, and after consulting with J. J. Williams, they concluded that it was better to sell than suffer a total loss; but that complainant did not disclose the fact that he had partners in the transaction.
They state that after returning to Tennessee after the ’four, they ascertained and believe that their agent, Bratton, was a partner in the purchase. Dp-on learning this, respondent J. J. Williams advised the filing of the bill by all the defendants, except C. F. Robertson. They-say that they have $210 of the Confederate money, which was thrown out as counterfeit.
*144 íl. E. 'Robertson, for himself and the minors, denies that their mother, C. E. Robertson, had any authority or right as guardian, or agent, to bind them, or dispose of their cotton.
Defendants C. E. Robertson and J. J. Williams insist that the contract was executory, and therefore void for illegality. Defendant II. E. Robertson answers, that he was a minor when his mother moved south; he supposes she acted for his best interest as she then thought, but that she acted on her own responsibility, nor did he at any time constitute' her his agent.
Defendants C. E. Robertson and J. J. Williams claim their rights under the bill, as if they were complainants. They deny that there was any implied warranty of the title of the cotton to the purchaser.
Defendant J. J. Williams says he does not know exactly what was done with all of said Confederate money — most of it, however, was placed in bank, to be funded in four per cent. Confederate bonds. The amount funded was never drawn from bank.
Defendant TI. J. Robertson says he did not hear of the trade of the cotton until some months after it •was made, and that he never repudiated it but once, and that was when he filed his bill; but he has never recognized the sale as binding on him. He nowhere states when he became of age.
An amended bill was filed by the original complainants, alleging that J. T. Morris was a partner with Simmons in the purchase of the cotton, and making his administrator, W. D. Williams, a party, *145 wbo answers that be knows nothing of tbe alleged partnership. But the proof shows that he was a partner.
■It is apparent from the allegations in the original bill, that it was filed under - the assumption that the contract for the sale of ' the cotton was void, because it was paid for in'. Confederate money, and because it was not an executed, but an executory contract. As the law is now ruled, this ground of objection to the contract ceases to be available.'
This question being out of the way, the first inquiry that arises, is, whether the contract was void on account of fraud on the part of Simmons, the purchaser. The proof shows that Simmons had knowledge that complainants were the owners of the cotton, and that C. IP. Bobertson, the widow, had taken charge and control of the estate, not as guardian or administratrix, but as the widow, and natural guardian. He was acquainted with the condition of the country, and of the dangers to which the cotton was exposed from the prevalence of marauding and plundering bands, which infested the country, and were engaged in an indiscriminate destruction and appropriation of all kinds of personal property. He knew the location of the cotton, and the special danger to which it was liable. He knew the uncertain value of this, as of all other kinds of personal property. With this knowledge he entered into an arrangement with J. IP. Morris to buy the cotton on speculation, and risk the dangers of putting it into market.
*146 The proof is abundant, that the preservation and protection of tbe cotton were attended witb constant dangers, and that its sale would be attended with much risk. It is further fully shown, that unless the cotton should be disposed' of, it would be a total loss; and that a large portion of it had already been lost, and that the agent of complainants had been able to dispose of only a small portion. According to the proof, the speculation, on which Simmons and Morris entered, was full of hazard and uncertainty. If it should succeed, the speculation might yield a good profit. "We are unable to see anything fraudulent in engaging in such a speculation, unless it was effected by resorting to misrepresentations in making the purchase. Complainants say in answer to the cross-bill, that the sale was made because of the representations of Simmons as to the danger of a total loss of the cotton to which it was exposed. The truth of the representations made is fully established by the proof, and it is rendered more than probable that the cotton would have been a total loss if Simmons had not made the purchase. "We are unable to see any ■ground on which defendant Simmons can be charged with fraud in making the purchase. It follows that Simmons got a good title to the interest of the widow in the one hundred and nine thousand pounds of cotton purchased. She assumed the right to sell the interest of herself and children, but as Simmons knew that she had no authority as guardian, or as legally appointed agent to sell, he bought at his own risk, *147 as to tbe interest of all the children who were not sui juris, or who had not expressly or impliedly given her authority to sell. As there had been no division of the estate, and no dower allotted to the widow, she would be entitled to one-third of the proceeds of the land and slaves that belonged to her husband at his death. She would be entitled to no share in the proceeds of the slaves that belonged exclusively to her children.
Although the widow is not entitled to sue for, and recover the third of the rents and profits, until dower is assigned, yet when dower is assigned, her claim relates back to the death of her husband, and, in a case like this, a court of equity would recognize her claim to the third upon the principle of regarding that as done which ought to have been clone.
Simmons, therefore, became the owner of the one-third of the cotton raised by the fifty-one slaves of the intestate on the land. If J. J. "Williams, by his marriage, became the absolute owner of the share of his wife in the cotton, then Simmons, by his purchase from the widow under the advice and consent of Williams, became the owner of Williams’ share. As soon as the contract was concluded, and the money paid, Simmons became the assignee and owner of Williams’ share.
This was one-fifth of thd cotton after deducting the one-third set apart for the widow. But it is insisted that Williams had never reduced his wife’s share to possession — in fact, that he had never seen it, and, therefore, that the title was not in him, but *148 in bis wife. It is not tbe actual manual possession of personal property on wbicb tbe husband’s marital right depends. If tbe legal title is in the wife, and it requires no resort to a court of equity to procure possession, tbe title of tbe husband becomes absolute upon tbe marriage. If tbe share of 'Williams’ wife bad been in tbe bands of an administrator or guardian, so that it could not be reached by Mm, except by a resort to a court of equity, bis transfer or assignment would not have defeated her equity. Such was not tbe case here, and Simmons became the owner of Williams’ share by bis purchase from tbe widow with Williams’ approbation: 2 Story Eq., § 1405.
The widow assumed tbe right to sell tbe share of H. J. Robertson. It does not appear whether be was of age or not at tbe date of tbe sale. He says in his answer to the cross-bill, that be was a minor when his mother removed South. He says be beard of tbe sale a few months, be thinks, after it was made; but be does not say whether be was then of age. He says bis mother supposed she was doing tbe best for his interest when she made tbe sale, but that he bad never authorized her to act as bis agent. He states that he never repudiated the sale until be filed this bill, but that be never recognized it. One witness proves that after his return to Tennessee he spoke frequently of tbe sale of tbe cotton, and never expressed dissatisfaction with it, but said they had lost nothing by the transaction, as they had vested tbe. Confederate money in lands.
*149 Under these circumstances, and as the proof shows that his mother had control of the estate, managing for the best interest of her children, and that he acquiesced without dissatisfaction in the sale until he was advised by Williams to file the bill, and repudiate the act "of his mother, we think that the circumstances sksw that he ratified the act of his mother in nqaking the sale; and as a consequence Simmons became the owner of his one-fifth of the cotton, after deductin the one-third share of Ms mother.
It follows that Simmons became, by his purchase, the owner of the shares of C. F. Robertson, the widow, and J. J. Williaíns and II. F. Robertson, and upon presenting the order to Bratton, the agent on the plantation, he was entitled to the amount of their three shares out of the one hundred and nine thousand pounds embraced in the purchase. As to their three shares he became a tenant in common with the three minor heirs. Although he believed he was purchasing the share of the minors, and although the widow thought she was selling, and as widow, mother, and natural guardian supposed she had the right to sell, and although under the circumstances she was justified, in view of the interest of the children, in making the sale, yet as Simmons knew that he was purchasing the shares of minors,, and that their mother had no legal right to sell, he must be regarded as taking possession of their shares of the cotton as a trustee for their benefit. As the proof shows no *150 bad faitb in taking possession of their shares, and no want of fidelity or diligence in his efforts to save the cotton, and convert it into money, he cannot in equity be held responsible for any more than the amount actually realized. The proof shows that the cotton hauled to G-ray’s gin was burned, and lost without any fault or negligence on Ms part.
He will, therefore, be held to account only for the amount received for the three bales shown to have been saved out of that lot and sold. After deducting from the whole amount received the one-third for the share of C. E. Robertson, as already explained, and the two-fifths of the residue for the shares of J. J. Williams and H. E. Robertson, he and Watterson, administrator of Morris, will be held to -account for the balance at its value in Hnited States currency at the time, with interest.
As it appears from the answers of the widow, C. E. Robertson, and J. J. Williams, that they received the Confederate money from Simmons, which in the contract was paid for the shares of the three minors in the cotton, and as Simmons and Morris are held accountable for the value in Hnited States currency of three shares in the proceeds of the sales of the cotton, it is deemed by the Court to be equitable that C. E. Robertson and J. J. Williams be held accountable for the value in Hnited States currency of that portion of the Confederate notes which were genuine, which they received for the shares of the three minors, and that *151 Simmons, and Morris, administrator, are entitled to a decree for that, and with interest. It follows that the decree of the Chancellor will be reversed, and the accounts will be- taken by the Clerk of this Court in accordance with this opinion.
The clerk will make his report on the proof in the record.
One half of the costs of this Court, and of the Court below, will be paid by Simmons and Watter-son, administrator of Morris, and the other half by 0. IP. Robertson and J. J. "Williams.